UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**A.M.**, a Minor, by her Parent and Next
Friend, **JOANNE McKAY**,

                             **Plaintiff,**               **1:10-cv-20**
                                                  **(GLS/RFT)**

          **v.**

**TACONIC HILLS CENTRAL SCHOOL
DISTRICT**,

                             **Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Kriss, Kriss Law Firm | DOMINICK J. BRIGNOLA, ESQ. |
| 350 Northern Boulevard, Suite 306 | |
| Albany, NY 12204 | |
| | |
| Gibbs Law Firm, P.A. | DAVID C. GIBBS, ESQ. |
| 5666 Seminole Boulevard | |
| Suite 2 | |
| Seminole, FL 33772 | |
| | |
| **FOR THE DEFENDANT:** | |
| Girvin, Ferlazzo Law Firm | SCOTT P. QUESNEL, ESQ. |
| 20 Corporate Woods Boulevard | PATRICK J. FITZGERALD, III, |
| 2nd Floor | ESQ. |
| Albany, NY 12211-2350 | |

**Gary L. Sharpe
Chief Judge**

<u>**MEMORANDUM-DECISION AND ORDER**</u>

## I. <u>Introduction</u>

Plaintiff A.M., a minor, by her parent and next friend, Joanne McKay, commenced this action under 42 U.S.C. § 1983 against defendant Taconic Hills Central School District ("Taconic"), alleging violations of her free speech rights under the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution. (*See* Compl., Dkt. No. 1.) Pending are the parties' cross-motions for summary judgment. (Dkt. Nos. 36, 37.) For the reasons that follow, Taconic's motion is granted and A.M.'s motion is denied.

## II. <u>Background</u>[1]

During the 2008-2009 academic year, the student council elected A.M., an eighth grader in Taconic's middle school, to be a co-class president.[2] (Pl.'s Statement of Material Facts ("SMF") ¶¶ 1-2, Dkt. No. 36, Attach. 3.) By virtue of her position, A.M. was permitted to deliver a "brief message" at the annual Moving Up Ceremony ("Ceremony") scheduled for June 25, 2009 in the school auditorium. (Def.'s SMF ¶ 7; Pl.'s SMF ¶ 7.)

---

[1] The facts are undisputed unless otherwise noted.

[2] Taconic is a K-12 public school system organized under the laws of the State of New York. (Def.'s Statement of Material Facts ("SMF") ¶ 1, Dkt. No. 37, Attach. 1.) "All grade levels of the Taconic Hills School District are housed within a single building in Craryville, New York, and share one main auditorium." (*Id.* ¶ 34.)

A few days before the Ceremony, A.M. asked her English teacher, Jamie Keenan, to look over her speech.  (Def.'s SMF ¶ 8.)  As Keenan read the speech, she came to the last sentence, which stated: "*As we say our goodbyes and leave middle school behind, I say to you, may the LORD bless you and keep you; make His face shine upon you and be gracious to you; lift up His countenance upon you, and give you peace.*"  (*Id.* ¶ 9.) Unsure if this sentence was appropriate for the Ceremony, Keenan advised A.M. to have Principal Neil Howard review the speech.  (*Id.* ¶ 12.) Keenan's concern was shared by Leanne Thorton, the faculty advisor for the student council, after she read A.M. and her co-class president's speeches on June 24, 2009.  (*Id.* ¶¶ 13-15.)

Though previous principals heard the speeches for the first time during the rehearsal on the morning of the Ceremony, Principal Howard, who was in his first year at Taconic's middle school, opted to go over them in his office.  (Pl.'s SMF ¶¶ 20, 22, 28.)  After reviewing A.M.'s speech, Principal Howard concurred with Keenan and Thorton's assessment, stating the closing line "sounded too religious."  (Pl.'s SMF ¶ 30; Dkt. No. 43 ¶ 11.)  A.M. disagreed and presented Principal Howard with literature on student free speech rights from the "Christian Law Association's web site."

(Pl.'s SMF ¶ 29; Def.'s SMF ¶¶ 22-23.)  However, this literature did not change his perspective, and Principal Howard advised A.M. that if she wished to deliver the speech, she would have to remove the last sentence. (Def.'s SMF ¶¶ 23-24.)  In response, A.M. asked Principal Howard to contact her mother, which he did shortly thereafter.  (*Id.* ¶ 25.)  During his conversation with A.M.'s mother, Principal Howard reiterated his assessment and proposed solution.  (*Id.* ¶ 26.)  However, A.M.'s mother was unsatisfied and requested that he contact Superintendent Mark Sposato about the speech.  (*Id.* ¶¶ 27-28.)  Principal Howard obliged and later that day met with Superintendent Sposato to discuss the matter.  (*Id.* ¶ 29.)

Following his review of the speech, Superintendent Sposato sought advice from Taconic's legal counsel.  (*Id.* ¶ 30.)  According to Taconic, its legal counsel agreed that the message sounded religious and moreover, that "delivering the religious message at a school sponsored event could violate the Establishment Clause."[3]  (*Id.* ¶ 31.)  Based on this advice, Superintendent Sposato contacted A.M.'s mother and informed her that

---

[3] Prior to the June 2009 Moving Up Ceremony, Taconic received complaints from the parents of a Jewish student, objecting to the display of a Christmas tree with ornaments on school property, and from the parents of a student who was a Jehovah's Witness, in response to the school's Halloween activities.  (Def.'s SMF ¶¶ 58-59.)

A.M. would not be permitted to give the speech unless the last sentence was removed.  (*Id.*)  Although she protested what she believed was "a violation of A.M.'s constitutional free speech rights," A.M.'s mother agreed to allow A.M. to deliver the speech without the last sentence.  (*Id.* ¶ 32.)

The Ceremony began at approximately 6 p.m. in the school's auditorium.  (Pl.'s SMF ¶ 7.)  While A.M. avers the Ceremony was run by the student council, she concedes that it was "generally organized and overseen" by Taconic's administrators.  (*See* Dkt. No. 43 ¶ 39.)  Nevertheless, it is undisputed that Taconic provided all of the following for the Ceremony: the requisite funds and insurance; the official announcements, which were sent on school letterhead; the event programs; and the "diplomas."  (Pl.'s SMF ¶¶ 4, 10; Def.'s SMF ¶¶ 35, 38, 44.)  In addition to music by the school band, the Ceremony was decorated with school "banners and signs with [Taconic's] name, logo and mascot," as well as orange and white balloons, Taconic's colors.  (Def.'s SMF ¶¶ 41-42.)  Finally, Taconic provided the podium and the microphone for the speeches.  (*Id.* ¶ 45.)

Although the Ceremony was neither mandatory nor graded, it was attended by the students' families, "Board of Education members, teachers,

staff, administrators, students and community members." (Pl.'s SMF ¶¶ 6, 8; Def.'s SMF ¶ 37.)  The Ceremony's speakers included Principal Howard, Board of Education President Ronald Morales and Taconic's high school valedictorian.  (Def.'s SMF ¶ 43.)  After being introduced by Principal Howard, A.M. began her speech with "'I'd like to take this opportunity to thank our families and friends for joining us tonight for our moving up celebration.'" (*Id.* ¶ 50.)  Despite disagreeing with Taconic's perception of the last sentence—which she described as a "blessing"—A.M. delivered the speech in accordance with Principal Howard's instructions.  (Pl.'s SMF ¶ 35; Def.'s SMF ¶ 54.)  Shortly thereafter, she commenced the instant suit.

In her Complaint, A.M. alleges that Taconic, Principal Howard and Superintendent Sposato violated her right to free speech as protected by the First Amendment of the United States Constitution, and Article I, Section 8 of the New York Constitution.  (*See* Compl. ¶¶ 23-33, Dkt. No. 1.) In a January 25, 2011 Memorandum-Decision and Order, this court dismissed A.M.'s claims against  Principal Howard and Superintendent Sposato in their official capacities as duplicative, but otherwise denied Taconic's motion to dismiss.  (*See* Dkt. Nos. 12, 22.)

### III.  **Standard of Review**

6

The standard of review under Fed. R. Civ. P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, No. 1:09-cv-652, 2011 WL 5599571, at *4 (N.D.N.Y. Nov. 17, 2011).

## IV.  *Discussion*

Though a public school student's right to free speech is not "shed . . . at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), it is "not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). This is so because of the "special characteristics" of the school environment and the need to ensure that student speech is consistent with the school's "basic educational mission." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal citations omitted). Ultimately, it is the province of the schools—and not the federal courts—to determine "what manner of speech" is appropriate for "the classroom or in school assembly." *Hazelwood*, 484 U.S. at 267 (quoting *Fraser*, 478 U.S. at 683).

Here, the success of either party rests in large part on the legal standard that is applied to the underlying facts. A.M. argues that *Tinker*

governs the instant case because she was expressing a religious viewpoint.  (*See* Dkt. No. 36, Attach. 1 at 10.)  Taconic counters that A.M.'s speech was attributable to the school, and thus *Hazelwood* provides the appropriate framework.   To this end, the court first discusses the controlling legal standard, and then, its application to the undisputed facts in this case.

**A.   School Sponsored Free Speech**

The essence of A.M.'s argument is that *Hazelwood* is inapplicable because the Ceremony was neither part of Taconic's curriculum nor a pedagogical exercise.  (*See* Dkt. No. 36, Attach. 1 at 9.)  Conversely, Taconic claims "this is not a case where A.M.'s speech *happens* to occur on school grounds[;] . . . [r]ather, A.M.'s message was the School District's speech, or at least attributable to [it]."  (*See* Dkt. No. 37, Attach. 2 at 16-17.)  The court concurs with Taconic.[4]

---

[4] Notably, the parties' opted not to substantively address the type of forum at issue. *See, e.g.*, *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142-43 (2d Cir. 2004) (discussing the relationship between the level of scrutiny applied to a restriction on speech and "the nature of the forum" in which the speech occurs.)  In spite of this omission, the court, after reviewing the uncontested facts, accepts Taconic's conclusory assertion that the school auditorium was a non-public forum.  (*See* Dkt. No. 37, Attach. 2 at 12); *see also Hazelwood*, 484 U.S. at 267 (School facilities will only be deemed "public forums" when they have been opened for "indiscriminate use by the general public, or by some segment of the public, such as student organizations . . . . If the facilities have instead been reserved for other intended purposes, communicative or otherwise, then no public forum has been created, and school officials may impose reasonable restrictions on" student speech) (internal quotations and

In *Hazelwood*, the Supreme Court explained *Tinker*'s shortcomings in addressing school-sponsored speech as follows:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, *whether or not they occur in a traditional classroom setting,* so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

484 U.S. at 270-71 (emphasis added); *see also Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989) (finding that a school election and election assembly were undoubtedly "'school sponsored' activities within the meaning of *Hazelwood*" because, *inter alia*, school officials "vetted the speeches in advance, . . . attempting to weed out or temper inappropriate content."). Simply put, "[i]f the speech at issue bears the imprimatur of the school and involves pedagogical interests, then it is school-sponsored

_____

citations omitted)); *Peck. v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626 (2d Cir. 2005) (stating that "[r]estrictions on speech in a nonpublic forum need only be reasonable and viewpoint neutral" to survive constitutional scrutiny) (internal citations omitted)).

speech." *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 924 (10th Cir. 2002).

Among other factors, "the level of involvement of school officials in organizing and supervising an event" is relevant in determining whether an activity bears the imprimatur of the school.  *Fleming*, 298 F.3d at 925; *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 307-08 (2000) (finding that a school endorsed a religious message where, *inter alia*, the school's public address system was used to deliver the message, and numerous indicia of the school, including banners and flags displaying the school's name, were present).  Though the Court has yet to define *Hazelwood*'s parameters, the Tenth Circuit concluded it contemplates any "activities that affect learning, or in other words, affect pedagogical concerns."  *Fleming*, 298 F.3d at 925; *see also Poling*, 872 F.2d at 762 ("The universe of legitimate pedagogical concerns is by no means confined to the academic; . . . [it includes] discipline, courtesy, and respect for authority.").  To this end, the Third, Ninth and Tenth Circuits each found graduation ceremonies to be "expressive activities" under *Hazelwood*.  *See Brody v. Spang*, 957 F.2d 1108, 1122 (3d Cir. 1992); *Nurre v. Whitehead*, 580 F.3d 1087, 1095 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 1937 (2010);

10

*Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1229 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 742 (2009).

Here, Taconic provided all of the following for the Ceremony: the venue, *i.e.,* the school auditorium; the funding and insurance; the official announcements, which were printed on its letterhead; the event programs; the diplomas the students received; and the microphone and podium for the speeches.  (Def.'s SMF ¶¶ 33, 35, 38, 44, 45; Pl.'s SMF ¶ 10.)  In addition, there was music by the school band; "banners and signs with [Taconic's] name, logo and mascot"; and orange and white balloons—Taconic's colors—flanking the stage.  (Def.'s SMF ¶¶ 41-42.)  Finally, A.M. was not only introduced by Principal Howard, but she also began her speech with "I'd like to take this opportunity to thank our families and friends for joining us tonight for our moving up celebration."[5]  (*See id.* ¶ 50.)

Despite admitting these facts, (*see* Dkt. No. 43 ¶¶ 19-21, 33, 35, 38, 41-42, 44-45, 50), A.M. still avers the Ceremony was not a curricular event because it was a non-graded, voluntary activity run by the student council

---

[5]  Notably, A.M.'s speech, like the election speeches in *Poling*, 872 F.2d at 762, was reviewed and edited by Principal Howard.  (Def.'s SMF ¶¶ 19-21.)  Although this fact is not dispositive, it demonstrates Taconic's belief that it would be accountable for any controversy resulting from A.M.'s speech.

and not by Taconic.  (*See* Dkt. No. 36, Attach. 1 at 9.)  However, the

*Hazelwood* Court explicitly stated its holding was not limited to "expressive

activities [that] . . . occur in a traditional classroom setting."  *See* 484 U.S.

at 271.  Furthermore, A.M. undermined her own argument.  Not only did

she fail to articulate the student council's role in planning and running the

Ceremony, but she also conceded the student council was subject to

faculty oversight, and "that the ceremony is run by" Taconic.  (Def.'s SMF ¶

13; Dkt. No. 43 ¶¶ 3, 13.)

In sum, the Ceremony was a school-sponsored expressive activity,

which was supervised by Taconic's faculty and "designed to impart

particular knowledge or skills to student participants and audiences."

*Hazelwood*, 484 U.S. at 271.  It follows that *Hazelwood*, and not *Tinker*, is

controlling.  *See id.*

**B.**     **The Reasonableness of Taconic's Conduct**

Though she failed to directly address the *Hazelwood* test, A.M.

claims that Taconic's censorship of the last sentence of her speech

amounted to impermissible viewpoint discrimination.  (*See* Dkt. No. 37,

Attach. 1 at 12-18.)  Taconic counters its conduct was reasonable in light of

its desire to avoid violating the Establishment Clause.[6]  (*See* Dkt. No. 37,

Attach. 2 at 19-23.)  Again, the court agrees with Taconic.

Under *Hazelwood*, "educators do not offend the First Amendment by

exercising editorial control over the . . . content of student speech in

school-sponsored expressive activities so long as their actions are

reasonably related to legitimate pedagogical concerns." 484 U.S. at 273.

Where, as here, the imprimatur prong is fulfilled, "the pedagogical test is

satisfied simply by the school district's desire to avoid controversy within a

school environment."  *Fleming*, 298 F.3d at 925-26 (collecting cases); *see*

*also Peck*, 426 F.3d at 633 (citing *Widmar v. Vincent*, 454 U.S. 263, 270-71

("concluding that avoidance of a violation of the Establishment Clause

could constitute a compelling state interest to justify a content-based

restriction in a limited public forum.")).

Here, Taconic sought to avoid controversy by removing the "blessing"

from A.M.'s speech.  Indeed, Principal Howard believed the last sentence

"sounded too religious" and "might offend people."  (Pl.'s SMF ¶ 30.)  Given

---

[6] While A.M.'s sole claim is a violation of her "free speech" rights, (*see* Compl. ¶¶ 23-33), her submissions contain multiple references to Establishment Clause cases.  (*See* Dkt. No. 36, Attach. 1 at 6-8.)  With the exception of Taconic's assertion that it sought to avoid violating the Establishment Clause when it censored A.M.'s speech, (Def.'s SMF ¶ 31; Dkt. No. 37, Attach. 2 at 19), the court cannot discern the relevance of A.M.'s discussion of, and citation to, Establishment Clause precedent.

the past complaints Taconic received from the parents of the Jewish and Jehovah's Witness students, and their desire to avoid violating the Establishment Clause, (Def.'s SMF ¶¶ 31, 58-59), its decision to edit the last sentence of A.M.'s speech was reasonable.

Rather than explaining why the restriction was not content-based, A.M. asserts Taconic engaged in viewpoint discrimination, and that there were alternative measures to avoid censoring the speech.  (Dkt. No. 36, Attach. 1 at 12-18.)  Besides being unpersuasive, these arguments are unsubstantiated.

A.M.'s viewpoint discrimination claim is meritless.  Unlike a subject-matter or content restriction, viewpoint discrimination involves the targeting of "particular views taken by speakers on a subject."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  While Taconic must "abstain from regulating speech when the specific motivating ideology . . . of the speaker is the rationale for the restriction," *Rosenberger*, 515 U.S. at 829, it is entirely permissible to "refuse to sponsor student speech that might reasonably be perceived . . . to associate the school with any position other than neutrality on matters of political controversy," *Hazelwood*, 484 U.S. at 272.  Irrespective of whether Taconic knew the

14

origin of the last sentence, or believed that it was not proselytizing—two points which A.M. belabors in her submissions—the restriction in question was content-based.  (*See, e.g.,* Pl.'s SMF ¶ 31.)

Moreover, the availability of an oral or written disclaimer is irrelevant. (*See* Pl.'s SMF ¶ 42; Dkt. No. 36, Attach. 1 at 16-18.)  As the Second Circuit stated in *Peck*, "[t]he *Hazelwood* standard does not require that the guidelines be the *most* reasonable or the *only* reasonable limitations, only that they be reasonable."[7] 426 F.3d at 630 (internal citations omitted). Notably, the Court in *Hazelwood* held that the principal's decision to remove two entire pages from the school newspaper, as opposed to just the offensive articles, was reasonable under the circumstances.  *See* 484 U.S. at 274.  By comparison, Taconic's restriction was *de minimus* given that it removed only the religious language.

Although Taconic remains subject to judicial scrutiny "when [its] decision to censor . . . student expression has no valid educational purpose," *Hazelwood,* 484 U.S. at 273, that is far from the case here.  The

---

[7] Throughout her submissions, A.M. insinuates that Taconic's conduct was impermissible because it did not have a formal policy for speech review.  (*See, e.g.*, Pl.'s SMF ¶ 21.)  However, a nearly identical argument was rejected by the Court in *Hazelwood*, where it stated "[t]o require such regulations in the context of a curricular activity could unduly constrain the ability of educators to educate."  484 U.S. at 273 n.6.

Ceremony was a pedagogical exercise designed to "impart lessons on discipline, courtesy, and respect for authority," *Corder*, 566 F.3d at 1229, and Taconic's content-based restriction was reasonably related to its goal of maintaining neutrality.  *See Peck*, 426 F.3d at 626.  Because Taconic was permitted to censor A.M.'s speech, her rights under the First Amendment were not violated, and Taconic is entitled to judgment as a matter of law.  As such, Taconic's cross-motion for summary judgment is granted and A.M.'s motion is denied.

## C.   <u>A.M.'s State Law Claim</u>

In light of the court's decision with respect to A.M.'s federal cause of action, her sole remaining claim, which is based on a violation of the New York State Constitution, is dismissed as an exercise of supplemental jurisdiction is inappropriate in this case.  *See* 28 U.S.C. § 1367(c).

## V.  <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Taconic's motion for summary judgment (Dkt. No. 37) is **GRANTED**; and it is further

**ORDERED** that A.M.'s motion for summary judgment (Dkt. No. 36) is **DENIED**; and it is further

16

  **ORDERED** that all claims against Taconic are **DISMISSED**; and it is further

  **ORDERED** that the Clerk close this case; and it is further

  **ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

January 23, 2012
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court